**Exhibit A**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(ALEXANDRIA DIVISION)

| | |
|---|---|
| **GLOBAL TELECOM & TECHNOLOGY AMERICAS, INC.** )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>**CMC NETWORKS (pty) Ltd.** )<br>)<br>Defendant. )<br>)<br>) | Case No. 1:13-cv-1092 (TSE/TCB) |

**CHRIS MCKEE DECLARATION**
**IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT**

I, Chris Mckee, submit this Declaration in the above styled proceeding and state as follows:

1. My name is Chris McKee. I am over 18 years of age, am competent to testify, and have knowledge of the facts set forth herein. I make this declaration in support of the Plaintiff's Motion for Default Judgment.

2. I am General Counsel and Executive Vice President of Corporate Development for Global Telecom & Technology Americas, Inc., ("GTT") the Plaintiff in this matter.

3. GTT's principal office is located at 8484 Westpark Dr., Suite 720, McLean, VA 22102. At all times relevant hereto, GTT was a provider of global telecommunications and data services to large enterprises, government and telecommunications carriers.

4. On or about March 15, 2007, GTT entered into a Master Services Agreement ("MSA") with Artel, LLC ("Artel"), a contractor for the United States Government, which established

1

GTT as an exclusive subcontractor for Artel for the provisioning of telecommunications services.

5. In 2010, Artel was awarded a government contract to provide telecommunications services to the United States Department of State. The government contract was known as Work Order 61 ("WO 61"). WO 61 provided for installation and service of various telecommunications circuits ("Circuits") in the Middle East, Africa, and Asia.

6. On or about November 10, 2010, the MSA was supplemented by service level commitments entered into by GTT and Artel, contemplating services GTT was to perform as a sub-contractor to Artel for the WO 61 project. The MSA as supplemented by the service level commitments is referred to herein as the "GTT-Artel MSA."

7. Pursuant to Section 3 of the GTT-Artel MSA, the term of the contract between GTT and Artel was to be from the period beginning March 15, 2007, through the date of termination or expiration of all the Service Orders executed by Artel. GTT derived a continued economic benefit pursuant to this contractual relationship.

8. Artel subsequently ordered from GTT, pursuant to the GTT-Artel MSA, the Circuits to be installed pursuant to WO 61. A separate service order ("Service Order") was executed by Artel for each Circuit ordered pursuant to the GTT-Artel MSA.

9. Service Orders for at least 28 Circuits were executed pursuant to the GTT-Artel MSA from the period November, 2010 through June, 2012.

10. GTT, in turn, contracted with its vendor, Defendant CMC, for provisioning of the Circuits pursuant to an MSA and service level agreements entered into between GTT and CMC. Although CMC is located in South Africa, it has, for several years, engaged in persistent

conduct and derived substantial revenue through its relationships with GTT by virtue of the networking services it performed for them.

11. In or about August 2011, GTT and CMC sought to develop a solution related to the inconsistent performance of certain of the Circuits. In order to facilitate this solution, GTT granted conditional permission to CMC to communicate directly with Artel. This permission was memorialized by an agreement entered into between CMC and GTT dated September 14, 2011 (the "CMC – Artel Permission Agreement"). A copy of the CMC-Artel Permission Agreement is attached to this Declaration as Exhibit 1.

12. The CMC – Artel Permission Agreement permitted CMC to communicate directly with Artel for the sole purpose of facilitating a solution to the inconsistent performance of certain of the Circuits. This agreement, however, expressly restricted CMC from selling services directly to Artel.

13. From the period beginning September, 2011, through the present, CMC solicited and sold, and continues to sell, services directly to Artel in breach of the CMC – Artel Permission Agreement. Specifically, beginning in September, 2011, CMC and Artel worked on the migration of various services from GTT to CMC using the same dedicated facilities that GTT was leasing from CMC, so that Artel and CMC could cut-out GTT as the middleman between Artel and CMC.

14. The GTT-Artel MSA was terminated by Artel on August 27, 2012, and the WO 61 services previously provided by GTT to Artel were thereafter provided by CMC.

15. CMC breached the contract by selling services directly to Artel thereby depriving GTT of revenue from the sale of those services.

3

16. As a result of CMC's breach of contract, Artel was able to cancel GTT's services prior to the expiration of the contracted for term and cease payments to GTT, because aside from GTT and CMC, no other company reasonably had the infrastructure in place to provide the services that GTT was providing to Artel pursuant to the GTT-Artel MSA, and because it knew it could obtain those services directly from CMC. Specifically, Artel cancelled GTT services for the following 28 Circuits and GTT was damaged in the amount of $1,846,162.46, set forth with specificity as follows:

   a. 11 of the Circuits, as a result of CMC's breach, were never installed with GTT and, instead, were provisioned by CMC. As a result, GTT lost profits from the one year period for which these Circuits were to be provisioned by GTT. These Circuits are set forth as follows twelve circuits which are set forth as follows:

| Circuit | Annual Revenue | Annual Cost | Profit Lost |
|---|---|---|---|
| Abu Dhabi | $372,240.00 | $342,000.00 | $30,240.00 |
| Islamabad | $279,168.00 | $241,320.00 | $37,848.00 |
| Beirut | $344,628.00 | $282,480.00 | $62,148.00 |
| Karachi | $129,720.00 | $88,800.00 | $40,920.00 |
| Manama | $267,156.00 | $217,200.00 | $49,956.00 |
| Muscat | $213,840.00 | $162,000.00 | $51,840.00 |
| Peshawar | $166,980.00 | $145,200.00 | $21,780.00 |
| Rabat | $179,088.00 | $135,684.00 | $43,404.00 |
| Dubai | $238,680.00 | $186,000.00 | $52,680.00 |
| Frankfurt | $56,160.00 | $16,500.00 | $39,660.00 |

| | | | |
|---|---|---|---|
| Lahore | $63,180.00 | $50,400.00 | $12,780.00 |
| **Total lost profit for 11 uninstalled circuits** | | | **$443,256.00** |

b. The remaining 17 Circuits were installed by GTT then were terminated without full payment. The costs attributable to these Circuits were paid by GTT and the profits lost from these Circuits are as follows:

| **Circuit** | **Profit lost** |
|---|---|
| Cairo | $15,009.68 |
| Jerusalem | $20,805.97 |
| Tel Aviv | $23,012.42 |
| Egelsbach | $12,716.13 |
| Almaty | $23,674.00 |
| Tunis | $51,830.25 |
| Casablanca | $26,267.44 |
| Algiers | $306,032.58 |
| Amman | $51,011.00 |
| Bayan | $211,379.00 |
| Riyadh | $243,852.00 |
| Dhahran | $67,210.00 |
| Colombo | $28,435.00 |

| | |
|---|---|
| Doha | $159,846.00 |
| Frankfurt MNS | $37,816.00 |
| Jeddah | $97,348.00 |
| Reston | $26,661.00 |
| **Total lost profit for 17 remaining Circuits** | **$1,402,906.46** |

17. Additionally, CMC's actions constituted an interference with GTT's contractual relationship with Artel, as well as GTT's future business expectancy. In this regard, CMC knew of the contractual relationship between Artel and GTT and was aware of GTT's receipt of economic benefits thereunder.

18. I have seen correspondence between CMC and Artel, reflecting that CMC intentionally interfered with the contractual relationship between GTT and Artel by:

a. Soliciting Artel to terminate the Artel-GTT relationship and contract directly with CMC;

b. Setting up a shell company, Rauzan, Ltd., to act as an alter-ego of CMC in an attempt to hide CMC's attempts to interfere with the Artel-GTT relationship; and,

c. Using confidential and proprietary information derived from its relationship with GTT to solicit a direct contractual relationship with Artel and to otherwise interfere with the Artel-GTT relationship.

19. CMC's correspondence with Artel reflects CMC's knowledge that its actions were improper and violative of the CMC – Artel Permission Agreement and would likely result in damage to GTT.

6

20. CMC's actions resulted in the termination of the relationship between Artel and GTT, the GTT-Artel MSA, and the Service Orders, because, with CMC working directly with Artel in violation of the CMC – Artel Permission Agreement, Artel was able to terminate its relationship with GTT and work directly with CMC.

21. As a result of CMC's interference with GTT's contract with Artel, GTT suffered damages in the amount of $1,846,162.46, as set forth in paragraph 16 of this Declaration.

22. CMC's intentional interference with the GTT-Artel MSA, the relationship between Artel and GTT, and the Service Orders referenced above, was committed maliciously, willfully and in reckless disregard for GTT's rights.

23. The GTT-Artel MSA memorialized a valid contractual relationship between GTT and Artel. Pursuant to this contractual relationship, GTT anticipated a continued economic benefit as a result of its performance of services in the form of renewals to the Service Orders contemplated above. GTT expected that these Service Orders would be renewed for at least an additional period of fifteen (15) months for which it was expected to receive substantial economic benefit.

24. CMC knew of Artel and GTT's contractual relationship and was aware of GTT's receipt of economic benefits thereunder. CMC was similarly aware of GTT's business expectancy and the economic benefits GTT expected to reap from the GTT – Artel relationship.

25. CMC intentionally interfered with GTT's business expectancy by:

a. Soliciting Artel to terminate the Artel-GTT relationship and contract directly with CMC;

b. Setting up a shell company, Rauzan, Ltd., to act as an alter-ego of CMC in an attempt to hide CMC's attempts to interfere with the Artel-GTT relationship; and,

7

 c. Using confidential and proprietary information derived from its relationship with GTT to solicit a direct contractual relationship with Artel and to otherwise interfere with the Artel-GTT relationship.

 26. CMC's actions resulted in the termination of the relationship between Artel and GTT and the GTT-Artel MSA thereby depriving GTT of the economic expectancy it would likely have derived from the relationship but for CMC's misconduct.

 27. As a result of CMC's interference with GTT's business expectancy, GTT suffered damages in addition to those set forth in paragraph 16 above for a period of fifteen months in the amount of $1,035,105.00 as specifically set forth below:

|           | **Monthly Profit** | **Profit Lost** |
|-----------|--------------------|-----------------|
| Abu Dhabi | $ 2,520.00         | $ 37,800.00     |
| Islamabad | $ 3,154.00         | $ 47,310.00     |
| Beirut    | $ 5,179.00         | $ 77,685.00     |
| Karachi   | $ 3,410.00         | $ 51,150.00     |
| Manama    | $ 4,163.00         | $ 62,445.00     |
| Muscat    | $ 4,320.00         | $ 64,800.00     |
| Peshawar  | $ 1,815.00         | $ 27,225.00     |
| Rabat     | $ 3,617.00         | $ 54,255.00     |
| Dubai     | $ 4,390.00         | $ 65,850.00     |
| Frankfurt | $ 3,305.00         | $ 49,575.00     |
| Lahore    | $ 1,065.00         | $ 15,975.00     |

|  | **Monthly Profit** | **Profit Lost** |
|---|---|---|
| Cairo | $ 840.00 | $ 12,600.00 |
| Jerusalem | $ 2,083.00 | $ 31,245.00 |
| Tel Aviv | $ 2,303.00 | $ 34,545.00 |
| Egelsbach | $ 410.00 | $ 6,150.00 |
| Almaty | $ 2,937.00 | $ 44,055.00 |
| Tunis | $ 2,448.00 | $ 36,720.00 |
| Casablanca | $ 378.00 | $ 5,670.00 |
| Algiers | $ 2,898.00 | $ 44,835.00 |
| Amman | $ 840.00 | $ 12,600.00 |
| Bayan | $ 2,268.00 | $ 34,020.00 |
| Riyadh | $ 2,100.00 | $ 31,500.00 |
| Dhahran | $ 546.00 | $ 8,190.00 |
| Colombo | $ 462.00 | $ 6,930.00 |
| Doha | $ 4,862.00 | $ 72,930.00 |
| Frankfurt MNS | $ 3,996.00 | $ 59,940.00 |
| Jeddah | $ 2,248.00 | $ 33,720.00 |
| Reston | $ 769.00 | $ 11,535.00 |
| **TOTAL** |  | **$ 1,035,105.00** |

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on November, 22, 2013.

_/s/ Chris McKee_____
Chris McKee

10

McKee Declaration Exhibit 1

## NON-SOLICITATION, NON-COMPETITION AGREEMENT

This NON-SOLICITATION, NON-COMPETITION AGREEMENT ("Agreement") is made and entered into effective on September 14, 2011, by and between **GLOBAL TELECOM & TECHNOLOGY AMERICAS, INC.**, a Virginia Corporation with its principal office located in Fairfax County, Virginia ("Employer"), and **CMC NETWORKS**.

In consideration of the payments to be made by GTT to CMC Networks for services provided under the CMC/GTT Contract number: 001/Ett/2006, signed on March 22, 2006, which CMC Networks agrees and acknowledges constitutes adequate and sufficient consideration, CMC Networks covenants and agrees that it will not:

(a) At any time during the next two (2) years, CMC Networks shall not sell services directly to ARTEL, Inc. or any subsidiaries of ARTEL, Inc. without first getting the express written consent of GTT.

(b) GTT specifically provides consent for CMC Networks to sell services directly to ARTEL, Inc. relating to any network augmentation associated with improved latency for sites 1 through 8 on WO61.

(c) CMC Networks agrees and acknowledges that its covenants set forth (i) are reasonable in geographic and temporal scope and in all other respects; (ii) are fair to CMC Networks; and (iii) have been made in order to induce GTT to enter into an agreement with CMC Networks to pay for services and GTT would not have entered into this agreement but for the covenants of CMC Networks contained herein.

The aforegoing covenants and agreements shall, however, not apply in the case of GTT being excluded from any future offers to do business or bids in respect of services on behalf of the US State Dept/ US Federal Government / DTS-PO in the event that GTT shall have been excluded from participating in any such future offers to do business or bids in respect of services for any reason whatsoever. In the latter event, CMC Networks shall not be prejudiced and shall be entitled, without prejudice to any of its rights under and in terms of any extant and ongoing services contracted for between GTT and CMC Networks on behalf of US State Dept/ US Federal Government / DTS-PO to sell services directly to the latter or via any other carrier client.

**CMC NETWORKS:**

**CMC NETWORKS**
By:_____
Name:____GRANT WALKER____
Title:____CEO____

**GTT:**

**GLOBAL TELECOM & TECHNOLOGY AMERICAS, INC.**
By:_____
Name:_____
Title:_____